UNITED STATES DISTRICT COURT
                     DISTRICT OF NEW HAMPSHIRE


<u>Debra Ann Chapin</u>

       v.                              Civil No. 11-cv-286-JL
                                       Opinion No. 2012 DNH 177
<u>Michael J. Astrue, Commissioner,</u>
<u>Social Security Administration</u>


                          **SUMMARY ORDER**

     Debra Ann Chapin has appealed the Social Security

Administration's denial of her application for Social Security

Disability Insurance benefits.  An administrative law judge at

the SSA ("ALJ") ruled that, despite Chapin's severe impairments

(including post-traumatic stress disorder and depression), she

retained the residual functional capacity ("RFC") to perform her

past relevant work, see 20 C.F.R. § 404.1560(b), as a mail house

worker, so she was not disabled, see id. § 404.1520(a)(4)(iv).

Although this decision was selected for review by the SSA's

Decision Review Board, see id. § 405.10(a)(1), it failed to

complete its review within the required time period, with the

result that the ALJ's decision became the SSA's final decision on

Chapin's application, see id. § 405.420(a)(2).  Chapin then

appealed the decision to this court, which has jurisdiction under

42 U.S.C. § 405(g) (Social Security appeals).

Chapin has filed a motion to reverse the decision.  See L.R. 9.1(b)(1).  She argues that the ALJ, in concluding that Chapin had the RFC to perform her past relevant work, erroneously gave more weight to the opinion of a consulting expert who did not treat her than to the opinions of other medical sources, including some of her treating physicians.  The Commissioner of the SSA has cross-moved for an order affirming the ALJ's decision.  See L.R. 9.1(d).  He argues that the ALJ properly gave limited weight to the opinions of Chapin's treating physicians because they were "inconsistent with the other substantial evidence in [her] case record," and supportably found that those opinions (as well as those of other medical professionals who did not treat her) were less persuasive than the opinions of the consulting experts according to the applicable criteria.  20 C.F.R. § 404.1527(c)(2).[1]

In making disability determinations, the SSA generally "give[s] more weight to opinions from [the applicant's] treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the applicant's] medical impairment(s)."  Id.  If the

---

[1]For ease of reference, the court has cited to the subsection numbers of the rule currently in effect, rather than those of the rule in effect at the time of the ALJ's decision.  See 77 Fed. Reg. 10651, 10656 (Feb. 23, 2012) (renumbering these provisions without changing their substance).

SSA "find[s] that a treating source's opinion on the issue(s) of the nature and severity of [the applicant's] impairment[s] is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [the SSA] will give it controlling weight."  Id.  Even if, applying these criteria, a medical source's opinion is not entitled to controlling weight, the SSA must still apply a series of specified factors in deciding what weight to give it.  See id.  These factors include:

>   (1) the length of the treatment relationship and the
>   frequency of examination;
>
>   (2) the nature and the extent of the treatment
>   relationship;
>
>   (3) the relevant evidence that the treating source
>   provides to support the opinion;
>
>   (4) the consistency of the opinion with the record as a
>   whole;
>
>   (5) whether the opinion is from a source who
>   specializes in medical issues related to the opinion;
>   and
>
>   (6) any other factors tending to support or contradict
>   the opinion.

Id. §§ 404.1527(c)(2)-(6).

Chapin argues that the ALJ misapplied these rules in giving only limited weight to the opinions of four medical professionals:  two psychiatrists, Abby Reinick and Ekaterina Hurst; a psychologist, Tracey Allyson; and a therapist, Melissa

3

Perrino. In fact, as the Commissioner points out, the ALJ expressly found that each of these opinions was inconsistent with other record evidence--which, in each case, he identified--so that the opinion did not merit controlling weight, even if it came from a treating medical source. The ALJ also properly considered the applicable factors in assigning weight to the opinions of certain medical sources over others insofar as they bore upon Chapin's residual functional capacity.

Reinick, Hurst, and Perrino are providers who saw Chapin at West Central Behavioral Health Center, a community mental health clinic, beginning in spring 2009 and continuing into 2010. The ALJ gave only "limited weight" to "[t]he opinions from the providers at West Central Behavioral Health," including Dr. Reinick's opinion that Chapin was unable to work due to her psychiatric conditions and Perrino's opinion that Chapin was moderately limited in understanding and remembering short and simple instructions, maintaining concentration and attention for extended periods, and asking simple questions and requesting assistance. The ALJ explained that these opinions were "not entirely consistent with the evidence of record," including "[t]reatment notes from West Central Behavioral Health." The ALJ observed that these notes showed, among other things, that Chapin "was babysitting for her neighbor for up to 14 hours a day

4

. . . . Her mental status exams were normal with adequate memory, attention span, and concentration."[2]

That is indeed what those treatment notes show. After Chapin's first and only visit with Dr. Reinick, in April 2009, her mental status exam reported that, while Chapin's "[m]ood was depressed, and [her] affect [was] mood congruent, constricted," her "[t]hought process is concrete, linear and goal oriented. Judgment and insight are fair." When Chapin saw Dr. Hurst in July 2009, her mental status exam reported that Chapin had "good eye contact and relates well," her "mood [was] somewhat depressed and affect is mildly constricted to full at times, mood congruent," her "thought process [was] goal directed," and her "[i]nsight and judgment [were] both fair."

The report of the mental status exam conducted during Chapin's second visit to Hurst, in March 2010, noted that Chapin's mood was "good and affect is full and bright," as well as that, while Chapin's recent and remote memory were not tested, they appeared to be within normal limits, as did her attention

---

[2] Chapin complains that the ALJ "did not address" Hurst's opinions. While the ALJ did not mention Hurst by name, she was one of Chapin's "providers at West Central Behavioral Health" and, as just noted, the ALJ specifically noted that he gave those opinions only limited weight. In any event, Hurst's observations and diagnoses of Chapin suggest no greater functional limitations than Reinick's (as discussed in part infra). Chapin does not argue to the contrary.

span and concentration.  Finally, when a third psychiatrist from West Central Behavioral Health conducted a mental status exam of Chapin in July 2010, he reported that her mood was "'all right' and [her] affect [was] full," her thought process was "linear and goal directed," and her "[j]udgment and insight [were] fair."

Chapin saw Perrino, the therapist, four times between late August and early October 2010.  During the first of these visits, Chapin said that she had "been babysitting for over a year and has never been paid . . . she works 14 hours days and is unable to say 'no' because [the person for whom she babysat] is her only friend."  This inability--and Chapin's work as a babysitter-- persisted until at least the time of her final documented visit with Perrino, when Chapin said "[s]he continues to feel responsible for the welfare of her neighbor's children and even on her 'day off' she cooks for the children and does laundry."

Accordingly, the ALJ did not err by finding that Reinick's opinion that Chapin's psychiatric condition left her "unable to pursue employment or hold employment at this time due to her psychiatric conditions," and Perrino's opinion that Chapin had "moderate limitations in understanding, memory, and concentration, were "inconsistent with other evidence in [the] case record" and therefore not entitled to controlling weight under 20 C.F.R. § 404.1527(c)(2).  This is to say nothing of the

fact that, regardless of their consistency with the rest of the record, neither of these opinions would be entitled to controlling weight for independent reasons.  By its terms, § 404.1527 does not apply to a medical source's opinion--like Reinick's--that the claimant is "disabled" or "unable to work," because that is the ultimate issue the ALJ must decide.  Id. § 404.1527(d)(1).  And, because Perrino is a therapist, she cannot serve as the source of a "medical opinion" subject to the provisions of § 404.1527, as Chapin acknowledges.  Social Security Ruling 06-03p, Titles II and XVI: Considering Opinions and Other Evidence from Sources who are not "Acceptable Medical Sources" in Disability Claims, 1992-2010 Soc. Sec. Rep. Serv. Supp. Pamphlet 327, 328-29 (2006).

   The ALJ also gave only "limited weight" to the opinions of Alysson, a psychologist who conducted an examination of Chapin in March 2010.  This examination included an "interview and a battery of in depth validated diagnostic psychological tests," the results of which Alysson took to reflect "not only impairments, but pervasive psychological disorganization." Specifically, Alysson diagnosed Chapin "with pervasive cognitive limitations," including impaired memory, concentration, and executive functioning.  Indeed, Alysson found that Chapin was markedly limited in her understanding, memory, concentration, and

7

persistence, as well as her ability to accept simple instructions and criticisms and to complete a normal workday and workweek. Chapin saw Alysson on a referral from Chapin's attorney, rather than from any of the medical professionals at West Central Behavioral Health who were treating Chapin at that time. Chapin did not receive any treatment from Alysson either before or after this examination. So Alysson was not a "treating source" under § 404.1527(c)(2), and Chapin does not argue otherwise.

Instead, Chapin argues that the ALJ failed to properly apply the factors set forth in § 404.1527(c)(2)-(6) in giving limited weight to Alysson's opinions, while giving great weight to the opinions of Dr. Michael Schneider, a state-employed psychologist who did not examine Chapin, but reviewed her medical records, in December 2009. In contrast to Alysson, Schneider concluded that, while Chapin suffered from affective, anxiety-related, and personality disorders, she retained the ability to understand, remember, and carry out short and simple instructions without special supervision, and to maintain adequate attention and complete a normal workweek, provided she was located at a "somewhat socially isolated workstation" and did not have to endure interactions with the general public or "overly critical" feedback from supervisors.

As this court has recognized, an ALJ can rely "exclusively on the assessments of non-testifying, non-examining physicians" in adjudicating a claimant's disability, and conflicts between those assessments and other medical testimony "are for the ALJ to resolve." Morin v. Astrue, 2011 DNH 091, 9-10 (citing Berrios Lopez v. Sec'y of HHS, 951 F.2d 427, 431-32 (1st Cir. 1991) and Tremblay v. Sec'y of HHS, 676 F.2d 11, 12 (1st Cir. 1982)). Furthermore, "[t]he ALJ decision to resolve that conflict against the claimant should be affirmed if "'that conclusion has substantial support in the record.'" Id. (quoting Tremblay, 676 F.2d at 12). While, as discussed supra, § 404.1527(c) lists factors for the ALJ to consider in deciding how much weight to give any medical opinion, it stops short of "requiring an ALJ's decision to apply expressly each of the six relevant factors in deciding what weight to give a medical opinion," so long as he provides "good reasons in his decision for the weight he gave to the [medical] opinions." Oldham v. Astrue, 509 F.3d 1254, 1258 (10th Cir. 2007).

The ALJ did that here. In according "only some weight" to Alysson's opinions, the ALJ explained that they were "not supported by the evidence of the record," including Chapin's "reports of her own mood being okay and her activities of daily living, along with objective reports from other providers." In

9

contrast, the ALJ explained that Schneider's opinion was "given great weight because it is consistent with and supported by the evidence of record" and Schneider "supported his opinion with references to the medical record."

This reasoning finds substantial support in the record. As just discussed, in March 2010--the very same month that Alysson examined Chapin--her treating psychiatrist, Hurst, noted that Chapin's mood was "good and affect is full and bright," and that her memory and concentration appeared normal. Between April 2009 and July 2010, in fact, three different psychiatrists reported that Chapin's thought process was "goal directed" (or "linear and goal directed") and her insight and judgment were "fair." Moreover, in August 2010, Chapin reported that she had been working for over a year (albeit for free) as her neighbor's babysitter, sometimes for as much as 14 hours a day, and, by October 2010, that she was even doing cooking and laundry for the family.[3] This evidence is inconsistent with Alysson's opinions

---

[3]Chapin argues that her "babysitting activity was a consequence of her mental illness," in that her "fear of abandonment, her inability to form stable relationships and her inability to stand up for herself[] made her so afraid that her only friend would reject and abandon her if she quit babysitting[] that she was unable to say no." This may explain why Chapin agreed to babysit without pay, but it does nothing to diminish the fact that she was able--despite her claimed limitations--to handle the demands of long days of caring for another person's children, including cooking and laundry, for more than a year. From this extensive and intensive period of

10

that Chapin's "pervasive psychological disorganization" imposed marked limitations on her understanding, memory, concentration, and persistence, and her ability to accept simple instructions and criticisms and to complete a normal workday and workweek.

The record evidence provides adequate support, then, for the ALJ's decision to reject those opinions in favor of Schneider's view that Chapin retained the ability to understand, remember, and carry out short and simple instructions without special supervision, and to maintain adequate attention and complete a normal workweek, albeit with certain accommodations. Chapin's arguments to the contrary are not persuasive.

First, she points out that, because Schneider's assessment accounted for neither Alysson's evaluation, completed in March 2010, nor "the year's worth of the [West Central Behavioral Health] psychiatrists' or other providers' notes regarding treatment [] Chapin received" there after December 2009, when Schneider completed his evaluation. But Alysson's opinion also failed to account for the treatment that Chapin received at West Central Behavioral Health, some of which post-dated Alysson's evaluation and the remainder of which she simply ignored (indeed,

---

babysitting, the ALJ was entitled to infer that Chapin did not suffer the disabling limitations identified by Alysson and others, even if other inferences are arguably permissible. See Morin, 2011 DNH 091, 25 n.21.

11

so far as the record indicates, Alysson reached her conclusions based solely on the interview and testing she conducted, without examining any of Chapin's treatment records).  Second, Chapin complains that Schneider lacked any "relationship with [her] that would give him the longitudinal view of her mental impairments that her treating psychiatrists had."  Again, though, the same is true of Alysson, who based her opinions on one day's worth of examination and testing and also never treated Chapin.  Because Alysson's and Schneider's opinions suffered from the same deficiencies, the ALJ acted properly in according more weight to Schneider's because, as he explained, it was superior in one key respect:  its consistency with Chapin's medical records.  See SSR 06-03p, 1992-2010 Soc. Sec. Rep. Serv. Supp. Pamphlet at 332.

The remainder of Chapin's arguments are likewise without merit.  She argues that the ALJ ignored the fact that the New Hampshire Department of Health and Human Services deemed Chapin eligible for Medicaid benefits, specifically, Aid to Partially and Totally Disabled Individuals, in March 2010.  As Chapin acknowledges, however, "[a] decision by . . . any other governmental agency about whether [the claimant] is disabled . . . is based on its rules" and is therefore not binding on the SSA.  20 C.F.R. § 404.1504.  Thus, as this court has observed, "ignoring [such] a conclusion is not error per se."  Dube v.

12

Astrue, 2011 DNH 31, 20-21 n.16 (citing cases).  While, as Chapin emphasizes, it might be "more troubling if relevant evidence of disability forming the basis of the state finding is in the record and ignored," id., that observation is inapt in this case. Here, the evidence forming the basis of the state's finding that Chapin was disabled appears to be the same as the evidence she submitted to the ALJ, viz., Alysson's report, together with records from her treatment at West Side Behavioral Health.[4]

Chapin also argues that the ALJ improperly "substitute[d] his judgment for that of treating medical professionals" in finding that, based on the range of scores Chapin received on the Global Assessment Functioning ("GAF") between 2008 and 2010, she did not have "a 12-month period of such severity that would prevent her" from performing her past relevant work.  The ALJ observed that Chapin's GAF scores was not "consistently as low as 41," which would indicate either "serious symptoms" or a "serious impairment in social, occupational, or school functioning," Diagnostic and Statistical Manual of Mental Disorders at 34 (4th

---

[4] As Chapin points out, the record before the state agency contains "a partial transcription" of her testimony recounting the "horrific circumstances" of domestic abuse that contributed to her PTSD.  While the court agrees with this characterization, there has never been any dispute that Chapin in fact has PTSD and, indeed, the ALJ specifically found that she does.

13

ed. text. rev. 2000). Instead, her scores "ranged from a 30-35 in March 2010 to as high as a 65 in December 2008."

Chapin argues that "these scores must be taken in chronological sequence as they were assigned to reflect the clinical trend of [her] mental ability to function."[5] But she points to nothing in the record, whether in the form of a medical opinion or otherwise, supporting the notion that her GAF scores during this period reflected her ever-diminishing capabilities. So the ALJ did not "substitute his judgment for that of treating medical professionals" in looking at the scores a different way. He simply drew a different inference from the one Chapin urges. In any event, as one court has observed, there is no "statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score in the first place." Kornecky v. Comm'r of SSA, 167 Fed. Appx. 496, 511 (6th Cir. 2006).

Finally, Chapin argues that the ALJ erred in ruling that Chapin's RFC allowed her to perform her past relevant work as a mail house worker, see 20 C.F.R. § 404.1560(b), "because he was

---

[5] It is worth noting that, after Chapin received her lowest reported GAF score (the 30-35 assigned by Allyson in early March 2010), she received a succession of higher scores: Hurst assigned a 45 later that same month, and Perrino (and another therapist at West Central Behavioral Health) assigned GAF scores between 52 and 55 in a series of sessions with Chapin between July 2010 and October 2010. So, even if there were a downward trend in Chapin's GAF scores between December 2008 and early March 2010, it was immediately reversed at that point.

basing his determination of current RFC on a flawed determination for all the reasons discussed previously, and failed to show her non-exertional impairments had negligible affect."  This is simply a restatement of Chapin's argument that the ALJ improperly weighed the evidence in determining her RFC, which the court rejects for the reasons already discussed at length.  Insofar as Chapin argues that the ALJ erred by finding that she "'is able to perform [her past relevant work] as it as actually performed,' not as she had performed it," that is incorrect.  See Gray v. Heckler, 760 F.2d 369, 372 (1st Cir. 1985).

Based on the foregoing, Chapin's motion to affirm the Commissioner's decision[6] is DENIED, and the Commissioner's motion to affirm that decision[7] is GRANTED.  See 42 U.S.C. § 405(g). The clerk shall enter judgment accordingly and close the case.

   **SO ORDERED.**

_/s/ Joe Laplante_
Joseph N. Laplante
United States District Judge

Dated:  September 28, 2012

cc:  Nancy C. Russell, Esq.
     Gretchen Leah Witt, AUSA

---

[6]Document no. 9.

[7]Document no. 13.

15